UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHAWN MARSHALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 1:23-cv-00442-JPH-TAB |
| | ) |
| STENNIS, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Shawn Marshall brings claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") based on allegations that his Qur'an was improperly confiscated and destroyed after he was transferred to Correctional Industrial Facility ("CIF"), which is a prison within the Indiana Department of Correction ("IDOC"). Dkt. 13 (Screening Order). Defendants moved for summary judgment. Dkt. 81. The Court then ordered supplemental briefing as to whether Mr. Marshall's transfer from CIF to another prison rendered his injunctive relief claims moot. Dkt. 92. Mr. Marshall has now been released from prison. Dkt. 98. For the reasons explained below, Defendants' summary judgment motion, dkt. [81], is **granted**.[1]

---

[1] The **clerk is directed** to update the docket to reflect that Defendant Stennis's first name is Belinda.

# I.
# Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's

factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

Likewise, Southern District of Indiana Local Rule 56-1(b) requires a party opposing summary judgment to submit a "Statement of Material Facts in Dispute" that identifies the potentially determinative facts and factual disputes that the party contends demonstrate an issue of fact precluding summary judgment.  S.D. Ind. Local R. 56-1(b).  In addition, under the Local Rules, "the facts as claimed and supported by admissible evidence by the movant are admitted without controversy" unless, as relevant here, the non-movant specifically controverts the facts in the movant's "Statement of Material Facts in Dispute" with admissible evidence and the non-movant provides citations to such evidence.  S.D. Ind. Local R. 56-1(e)–(f).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.[2]

---

[2] Defendants argue that Mr. Marshall's response to their motion for summary judgment does not comply with the Local Rules and fails to designate evidence that establishes a question of material fact.  Dkt. 88.  Mr. Marshall's materials, however, designate specific evidence in some places.  Dkt. 86 at 3 (referencing Defendant Stennis's answers to interrogatories); dkt. 85 at 11 (citing to Exhibit W).  Also, Mr. Marshall's response brief is signed under penalty of perjury, effectively converting it into a summary judgment affidavit.  Dkt. 85 at 12; *see also* 28 U.S.C. § 1746.  Therefore, the Court also considers as designated evidence Mr. Marshall's factual assertions made in the brief that appear to be based on Mr. Marshall's personal knowledge and otherwise admissible.

### A. The Parties

Mr. Marshall arrived at CIF from another IDOC facility in February 2023, at which time Defendant Stennis was a property room officer.  Dkt. 47-1 at 2–3.  He was incarcerated at CIF when this lawsuit was filed.  Dkt. 1.

### B. Confiscation and Destruction of Qur'an

When Mr. Marshall arrived at CIF, his personal property included an Arabic-language Qur'an, which he needed to practice his religion.  *See* dkt. 85 at 7–9.  The Qur'an had the name and IDOC identification number of another inmate written in it.  Dkt. 1 at 3.  The Qur'an was not confiscated when Mr. Marshall's property was inventoried at his previous prison before he was transferred to CIF.  Dkt. 85 at 5 ("So it is an undisputed fact that Mr. Marshall arrived at C.I.F. with his Holy Qu'ran that was inventoried before he left Miami Correctional Facility.").

The parties agree that the Qur'an was confiscated at CIF, although they disagree about who was responsible for the confiscation.  As discussed below, *see* Section III(B)(2), n.5, the Court need not resolve that dispute to rule on Defendants' motion for summary judgment.  In short, Officer Stennis maintains that she was not the officer who decided to confiscate the Qur'an, dkt. 47-1 at 3, while Mr. Marshall designates evidence showing that Officer Stennis played a role in the confiscation.  *See, e.g.*, dkt. 86-1 at 43–44 (Inmate Malik Fields stating under penalty of perjury that he heard Mr. Marshall's conversation with Officer Stennis and that "she advised [Mr. Marshall] that he was not getting his Holy Qu'ran because someone else's name was written

inside of it with his name" and told Mr. Marshall that "she made final decisions in the property room").

Although Officer Stennis denies responsibility for the decision to confiscate the Qur'an, she admits that she was working in the property room at the time and that she "reiterated [to Mr. Marshall] what [the other officer working in the property room] let him know, which is that he is not allowed to have anyone else's personal information, per IDOC policy. It's unauthorized possession of property." Dkt. 82-8 at 2. She also answered an interrogatory about whether any policy states that the presence of another inmate's name in a book means it was stolen by stating, "Not necessarily stolen, but it's considered possession of another offender's personal information (especially because here, Mr. Marshall possessed a Quran with another offender's name and DOC number in it). Mr. Marshall should not have had access to another offender's name and DOC number for that offender's safety and security." *Id.* at 2.

In support, Officer Stennis cites the IDOC's Adult Disciplinary Code, which makes "[u]nauthorized possession, destruction, alteration, damage to, or theft of property, State property, or property belonging to another person" a Class A offense. Dkt. 82-6 at 6. Mr. Marshall concedes that "[h]aving someone name and IDOC number is also a conduct report," although he notes that he did not receive a conduct report after his Qur'an was confiscated. Dkt. 85 at 9 (errors in original). Mr. Marshall also cites to a portion of the IDOC's Adult Disciplinary Code, which makes "[p]ossessing . . . unauthorized personal

5

information regarding another offender . . . , including but not limited to . . .

offender packets, medical or mental health records, Social Security Numbers,

home addresses, financial information, or telephone numbers, except as

authorized by a court order or as approved in writing by the Warden" a Class B

Offense.  *See* dkt. 86-1 at 8 (citing dkt. 82-6 at 9, Offense 247).[3]

      The parties also disagree about whether Mr. Marshall consented to the

destruction of the Qur'an.  According to Officer Stennis, when the Qur'an was

confiscated, Mr. Marshall was given the choice whether to mail the Qur'an—

along with other personal property—to his home, gate release it, or have it

destroyed, and he signed a form indicating that he wanted it destroyed.  Dkt.

47-1 at 3–4; dkt. 82-8 at 2–3.  Mr. Marshall maintains that his signature on

the form indicates only his assent to the destruction of other property and that

he was never given the chance to mail anything home.  Dkt. 85 at 2–3.

---

[3] Elsewhere in his response brief, Mr. Marshall states, "This policy that they are stating is not a policy.  This name written inside my Holy Qu'ran was not any type of gang issue, nor did it cause any harm or safety to the welfare of the institution."  Dkt. 85 at 6–7.  Given his statement that inmates can receive conduct reports for possessing other inmates' names and IDOC numbers, the Court does not understand this statement to mean that the IDOC does not prohibit inmates from having such information.  Instead, the statement appears to relate to the distinction Mr. Marshall draws between a "policy" and a "conduct report," as elaborated at his deposition.  *See, e.g.,* dkt. 82-1 at 61 (when asked if he agreed that "policy states that you cannot possess the personal property of another offender," answering, "That's not a policy. That's a conduct report—that's a conduct code that you just read.  That's not nowhere in the policy.  What you're showing me is a conduct code . . . .  That is not a policy, ma'am.").  Regardless, even if Mr. Marshall intends to dispute whether the Adult Disciplinary Code actually forbids inmates from having other inmates' names and IDOC numbers, it is undisputed that the Adult Disciplinary Code prohibits them from having property that belongs to other inmates and "unauthorized personal information" about other inmates.

Regardless of whether it was done with Mr. Marshall's consent, it's undisputed that the Qur'an was destroyed.  Dkt. 86-1 at 27.

**C. Events After Destruction of Qur'an**

After the Qur'an was destroyed, Mr. Marshall was not able to access or obtain another Arabic-language Qur'an at CIF because they were not sold on the commissary and the chaplain did not give him one.  Dkt. 85 at 3.  He filed a grievance about the issue and asked for his Qur'an back.  Dkt. 86-1 at 1, 5. In response, he was told that the Qur'an was confiscated because it had another inmate's name and IDOC identification number in it and "[i]t appears it does not belong to you and per policy you can not have property that belongs to another offender in your possession."  *Id.* at 5.

Mr. Marshall initiated this case by filing a complaint.  Dkt. 1.  The Court screened the complaint, liberally construing it to include claims for monetary damages and injunctive relief against several Defendants, concluding that "[t]he First Amendment and RLUIPA claims include all of the viable claims identified by the Court."  Dkt. 13 at 4.  The screening order also gave Mr. Marshall a deadline to identify any additional claims that he believed were alleged in the complaint but not identified by the Court.  *Id.*  Mr. Marshall did not seek leave to amend his complaint or otherwise identify any additional claims.

Later, Mr. Marshall filed a notice of address change, indicating that he has now been released from prison.  Dkt. 98.  The IDOC's website also confirms that Mr. Marshall is no longer in IDOC custody.[4]

### III.
### Discussion

Mr. Marshall is pursuing First Amendment and RLUIPA claims for injunctive relief against IDOC and a First Amendment claim for money damages against Officer Stennis in her individual capacity.  Dkt. 13 (screening order); dkt. 92 at 1–2 n.1 (substituting IDOC for Warden Reagle); *see Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009) (RLUIPA does not authorize individual-capacity claims against state officials), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019); *see Sossamon v. Texas*, 563 U.S. 277, 285–86 (2002) (states do not consent to waive their sovereign immunity to suits for money damages under RLUIPA when accepting federal funds).  In some parts of his summary judgment related filings, however, Mr. Marshall argues that his due process rights were violated when Officer Stennis did not offer him the chance to have his Qur'an picked up or mailed home rather than destroying it.  *See, e.g.,* dkt. 85 at 5–6 ("clearly by Defendant not following the policy of IDOC violated Plaintiff's due process").

To repeat, the only claims in this case are claims for violations of the First Amendment and RLUIPA; this case does not involve any claim for a violation of Mr. Marshall's due process rights.  The Court did not allow Mr.

---

[4] *See* https://offenderlocator.idoc.in.gov/idoc-ofs-1.0.2/ofs (stating Mr. Marshall was returned to court authority on release) (last visited Feb. 24, 2025).

Marshall to proceed with Fourteenth Amendment due process claims at screening, and he did not take the Court up on its offer to identify "additional claims . . . alleged in the complaint but not identified by the Court."  *See* dkt. 13 at 4.  Mr. Marshall also asserts in his summary judgment filings that the "Equal Protection Clause of the Fourteenth Amendment" was violated by Defendants' conduct, *see* dkt. 85 at 8, but again, this case does not involve a claim based on equal protection.  *See* dkt. 13.  So, Mr. Marshall's only claims presented in this case are those alleging violations of the First Amendment and RLUIPA.

### A. Injunctive Relief Claims

Mr. Marshall seeks an injunction against the IDOC, but he has been released from prison and there is no indication that he is likely to return or that his religious practice will be burdened if he does.  Thus, his claims for injunctive relief are moot.  *See Koger v. Bryan*, 523 F.3d 789, 804 (7th Cir. 2008) (request for injunctive relief under RLUIPA rendered moot by release from prison); *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot.").  The result is that the Court lacks jurisdiction over the claims against the IDOC for injunctive relief.  *See United States v. Sanchez-Gomez*, 584 U.S. 381, 385–86 (2018) (federal courts lose subject matter jurisdiction if, "at any point during the proceedings," the case becomes moot).

Accordingly, Defendants' summary judgment motion is **granted** to the extent that Mr. Marshall's First Amendment and RLUIPA claims for injunctive relief are **dismissed for lack of jurisdiction**.

## B. Damages Claim

Mr. Marshall's claim for money damages against Officer Stennis in her individual capacity is based on past violations of the First Amendment, so it is not moot. Officer Stennis raises multiple arguments as to why she is entitled to summary judgment, *see generally* dkt. 82, but the Court addresses only her qualified immunity argument because it is dispositive.

### 1. Qualified Immunity Standard

Qualified immunity "shields a government official from suit for damages when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (en banc) (cleaned up). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (cleaned up).

Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once a defendant raises it. *Archer v. Chisolm*, 870 F.3d 603, 613 (7th Cir. 2017). To overcome the defense, a plaintiff must show that: (1) the defendant violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct. *Sabo*, 128

F.4th at 843.  Courts may exercise their discretion to choose which element to address first.  *Id.*  The second element is dispositive in this case, so the Court begins and ends its analysis there.

A constitutional right is "clearly established" when "the law is sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Id.* at 843–44 (cleaned up).  To clearly establish a right, "existing precedent must place the constitutional . . . question beyond debate."  *Id.* at 844 (cleaned up).

The Supreme Court has instructed lower courts not to define clearly established law "at too high a level of generality."  *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021); *see also Sabo*, 128 F.4th at 844 (collecting cases).  Doing so evades the crucial question in a qualified immunity analysis, which is "whether the official acted reasonably *in the particular circumstances* that he or she faced."  *Id.* (cleaned up; emphasis in original).  The right has been defined "too generally if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established."  *Id.* (cleaned up; brackets in original).  "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (cleaned up).

Existing precedent need not be "directly on point" to clearly establish a right.  *Id.* at 545 (cleaned up).  However, to meet his burden on this element, a

plaintiff must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). The failure to do so means that a plaintiff "cannot defeat" a "qualified immunity defense." *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (reversing summary judgment denial on qualified immunity grounds because plaintiff did not identify a sufficiently analogous case or explain why defendant's actions were plainly excessive).

### 2. Application

To succeed on his First Amendment free-exercise claim, Mr. Marshall must show that Officer Stennis "personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). "A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (cleaned up). That said, even a substantial burden is permitted if the burden is "reasonably related to legitimate penological objectives." *Vinning-El v. Evans*, 657 F.3d 591, 592−93 (7th Cir. 2011). The Seventh Circuit has, however, rejected an attempt to define the relevant clearly established right for qualified immunity purposes as "the right of prisoners not to have their religious practices interfered with and prevented absent a legitimate penological basis," characterizing that formulation as "too broad." *Kemp v. Liebel*, 877 F.3d 346, 352 (7th Cir. 2017). Instead, outside a case where the "reasonable relation to legitimate penological

objectives" standard has obviously been violated, the "clearly established right" inquiry must be narrower. *Id.* at 352–53 (holding that the proper inquiry in that case was whether there existed a "clearly established constitutional right on the part of prisoners to congregate services and study absent appropriate leadership and supervision at the time of an interfacility transfer").

Here, Officer Stennis argues that Mr. Marshall did not have a clearly established First Amendment Free Exercise right to possess a Qur'an that violated a religiously neutral IDOC rule.[5]  Dkt. 83 at 16–18.  To defeat qualified immunity, Mr. Marshall must therefore identify a reasonably analogous case or show that any reasonable officer would have known that Officer Stennis's actions violated the First Amendment.

Mr. Marshall does not point to a reasonably analogous case.  Indeed, his summary judgment response does not explicitly mention qualified immunity at all.  *See generally* dkt. 85.  Instead, his only argument as to whether a clearly established right was violated consists of conclusory statements that his First Amendment rights were violated.  *See, e.g., id.* at 5 (stating that the failure to give him a chance to mail his Qur'an home or have it picked up by a friend or family member "clearly violates Plaintiff First Amendment").

The Court has reviewed the cases cited by Mr. Marshall in his response brief.  *See generally* dkt. 85.  Some of those cases generally recognize that a substantial burden on religious practice must be reasonably related to

---

[5] The Court assumes for the sake of this analysis that Officer Stennis was personally responsible for the confiscation and destruction of Mr. Marshall's Qur'an.

legitimate penological interests, *see, e.g.*, *Kaufman v. Pugh*, 733 F.3d 692, 696

(7th Cir. 2013), but that formulation of the right at issue is too general.  In

sum, none of the cases cited by Mr. Marshall show that he had a clearly

established First Amendment Free Exercise right to possess a Qur'an that

violated a religiously neutral IDOC rule.

The only case Mr. Marshall cites that is even arguably factually

analogous to this one is *Tariq v. Chatman*, No. 1:11-CV-159 (WLS), 2012 WL

3637386 (M.D. Ga. July 18, 2012), *report and recommendation adopted by*

2012 WL 3637729 (M.D. Ga. Aug. 22, 2012).  There, the plaintiff alleged that

the defendants confiscated and destroyed his Qur'an because it was "radical

and contain[ed] messages of hate."  *Id.* at *3.  Here, in contrast, it's undisputed

that Officer Stennis confiscated and destroyed Mr. Marshall's Qur'an because it

violated a religiously neutral IDOC rule—having another inmate's name and

IDOC number in it—not because of the Qur'an's content.  So, *Tariq* involved

fundamentally different facts.  Moreover, unreported district court decisions

cannot clearly establish a constitutional right for qualified immunity purposes

in a civil rights action.  *See Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020).

Mr. Marshall has therefore cited "neither controlling nor a robust

consensus of persuasive authority that establish the right to be free of the

conduct in this case."  *Cibulka v. City of Madison*, 992 F.3d 633, 641 (7th Cir.

2021) (cleaned up).  Given his *pro se* status, the Court has done its own review

of potentially applicable Seventh Circuit cases, *Taylor v. Schwarzhuber*, 132

F.4th 480, 487 (7th Cir. 2025), and found no reasonably analogous case

14

showing that Mr. Marshall had a clearly established First Amendment Free Exercise right to possess a Qur'an that violated a religiously neutral IDOC rule.

Next, Mr. Marshall has not shown that Officer Stennis's conduct was "so egregious that it is an obvious violation of a constitutional right." *Id.* (cleaned up). In fact, he makes no argument at all on this point other than his conclusory assertions that it is obvious that his constitutional rights were violated. Instead, he devotes most of his response to identifying IDOC policies that he believes Officer Stennis violated in dealing with his property. *See generally* dkt. 85 (identifying various IDOC policy violations, such as searching his property when he was not present and failing to give him the proper form to indicate how he wanted to dispose of his property). But violations of IDOC policies would not establish that Officer Stennis violated his First Amendment rights. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("Section 1983 protects against constitutional violations, not violations of . . . departmental regulation and . . . practices[.]" (cleaned up)).

Mr. Marshall also contends, without citation to authority, that having another inmate's IDOC number presented no safety threat. *See* dkt. 85 at 6–7. But the relevant question here is not whether his Qur'an posed a safety threat, but whether Mr. Marshall had a clearly established right to not have his Qur'an confiscated because it contained information about another inmate in violation of IDOC policies.

Defendants' summary judgment motion is **granted** as to Mr. Marshall's First Amendment claims for damages against Officer Stennis in her individual capacity.[6]

## IV.
## Conclusion

For the reasons stated above, Defendants' motion for summary judgment, dkt. [81], is **granted**.  Mr. Marshall's First Amendment and RLUIPA claims for injunctive relief are **dismissed for lack of jurisdiction as moot**, and his First Amendment claim for damages is **dismissed with prejudice**.  Final judgment will issue by separate entry.

The **clerk is directed** to update the docket to reflect that Defendant Stennis's first name is Belinda.

**SO ORDERED.**

Date: 5/21/2025

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

SHAWN MARSHALL
P.O. Box 1523
Thomasville, GA 31799


All electronically registered counsel

---

[6] Because Mr. Marshall has not satisfied the "clearly established" element, the Court does not address whether the Defendants violated Mr. Marshall's First Amendment rights.  *See Sabo*, 128 F.4th at 843.